# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA



*CENTRAL DISTRICT OF CALIFORNIA*
*APPROVED FORM FOR PRODUCING A*

# CHAPTER 11 DISCLOSURE STATEMENT

**Microsoft Word Format**

Revised October 2010

**F 3017-1**

Michael R. Totaro 102229
Totaro & Shanahan
P.O. Box 789
Pacific Palisades, CA 90272
301 573 0276 (v) 301 496 1260 (f)
tsecfpacer@aol.com
www.Totaroandshanahan.com

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>GENUTEC BUSINESS SOLUTIONS, INC,<br><br>                                    Debtor | Bk. No. 8:14-bk13115-ES<br><br>In a Case Under Chapter 11 of the Bankruptcy Code<br>(11 U.S.C. § 1101 et seq.)<br><br>     FIRST AMENDED ORIGINAL DISCLOSURE<br>     STATEMENT DESCRIBING THE FIRST<br>     AMENDED  CHAPTER 11 PLAN<br><br>Disclosure Statement Hearing<br><br>Date:      June 4, 2015<br>Time:      10:30 am<br>Ctrm:      5A 411 W Fourth St. Santa Ana CA 92701<br><br><br>Plan Confirmation Hearing<br>Complete This Section When Applicable<br><br>Date:      August 18, 2015<br>Time:      10:30 am<br>Ctrm:      5A 411 W. Fourth St. Santa Ana, CA |

Revised October 2010

# F 3017-1

# **TABLE OF CONTENTS**

**I. INTRODUCTION**      1

A.    Purpose of This Document.................................................................................1

B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ....................2

   1.   Time and Place of the Confirmation Hearing ................................................2

   2.   Deadline for Voting For or Against the Plan..................................................2

   3.   Deadline for Objecting to the Confirmation of the Plan……………………………3

   4.   Identity of Person to Contact for More Information Regarding the Plan……………3

C.    Disclaimer……………………………………………………………………………………3

**II. BACKGROUND**      3

A.    Description and History of the Debtor's Business...........................................3

B.    Principals/Affiliates of the Debtor's Business………………………………………4

C.    Management of the Debtor Before and After the Bankruptcy………………………4

D.    Events Leading to Chapter 11 Filing………………………………………………4

E.    Significant Events……………………………………………………………………5

   I.   Bankruptcy Proceedings…………………………………………………………5

   2.   Other Proceedings…………………………………………………………………6

   3.   Actual and Projected Recovery of Preferential or Fraudulent Transfers……………6

   4.   Procedures Implemented to Resolve Financial Problems………………………6

   5.   Current and historical Financial Conditions………………………………………6

**III. SUMMARY OF THE PLAN OF REORGANIZATION……………………………………… 6**

A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan………… 6

B.    Unclassified Claims……………………………………………………………… 7

   1.   Administrative Expenses…………………………………………………………7

   2.   Priority Tax Claims………………………………………………………………8

C.    Classified Claims and Interests………………………………………………………8

   1.   Class 1: Secured Claims…………………………………………………………8

2.    Class 2: Priority Unsecured Claims……………………………………………………………8

3.    Class 3: General Unsecured Claims…………………………………………………………8

4.    Class 4: Interest Holders…………………………………………………………………10

D.    Means of Effectuating the Plan…………………………………………………………11

1.    Funding for the Plan……………………………………………………………………11

2.    Post-Confirmation Management……………………………………………………………11

3.    Disbursing Agent…………………………………………………………………………11

E.    Risk Factors……………………………………………………………………………12

F.    Other Provisions of the Plan……………………………………………………………...12

1.    Executory Contracts and Unexpired Leases………………………………………………12

2.    Changes in Rates Subject to Regulatory Approval……………………………………........12

3.    Retention of Jurisdiction…………………………………………………………………12

G.    Tax Consequences of Plan………………………………………………………………12

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES……………………………………12

A.    Who may Vote or Object…………………………………………………………………13

1.    Who May Object to Confirmation of the Plan……………………………………………13

2.    Who May Vote to Accept/Reject the Plan…………………………………………………13

a. What is an Allowed Claim/Interest…………………………………………………13

b. What is an Impaired Claim/Interest…………………………………………………14

3.    Who is Not Entitled to Vote………………………………………………………………14

4.    Who Can Vote in More Than One Class……………………………………………………14

5.    Votes Necessary to Confirm the Plan………………………………………………………14

6.    Votes Necessary for a Class to Accept the Plan……………………………………………15

7.    Treatment of Nonacceptiing Classes………………………………………………………15

8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)…………………………15

B.    Liquidation Analysis………………………………………………………………………16

C.    Feasibility…………………………………………………………………………………17

**F 3017-1**

**V. EFFECTS OF CONFIRMATION OF PLAN**................................................................................**18**

   A.    Discharge...............................................................................................18

   B.    Revesting of Property in Debtor.......................................................18

   C.    Modification of Plan.............................................................................19

   D.    Post-Confirmation Status Report.......................................................19

   E.    Quarterly Fees....................................................................................19

   F.    Post-Confirmation Conversion/Dismissal..........................................19

   G.    Final Decree........................................................................................20

   H.    Pending Litigation...............................................................................20

**VI. SUPPORTING DECLARATION**..........................................................................**21**

   Exhibit A: List of All Contracts..............................................................22

**F 3017-1**

# I.

## INTRODUCTION

Genutec Business Solutions, Inc (**"Debtor"**) is the Debtor/Debtor in Possession in a Chapter 11 bankruptcy case.  On May 16, 2014, Debtor  commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101 et seq., Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan").  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a reorganization plan.  In other words, the Proponent seeks to accomplish payments under the Plan by three different alternatives to be explained *infra*. The Effective Date of the proposed Plan will be the 30th day after the date the Court signs the Order Confirming the Chapter 11 Plan.

**A.    Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

<u>**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**</u>:

(1)    **WHO CAN VOTE OR OBJECT,**

(2)    **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

(3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

(4)    **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

(5)    **WHAT IS THE EFFECT OF CONFIRMATION, AND**

(6)    **WHETHER THIS PLAN IS FEASIBLE.**

F 3017-1

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.    Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on August 18, 2015 at 10:30 am in Courtroom 5A of the court located at 411 W. Fourth St. Santa Ana, CA 92701.

**2.    Deadline for Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to: Michael R. Totaro, Totaro & Shanahan, P.O. Box 789, Pacific Palisades, CA 90272. Ballots may also be returned by fax to 310 496 1260 or by email to Mtotaro@aol.com. If returned by email you will receive email confirmation of receipt. If by fax please call to confirm receipt.

Your ballot must be received at least 14 days prior to the date set for the confirmation hearing or it will not be counted.

**F 3017-1**

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon Debtor and counsel 14 days prior to the date set for the confirmation hearing.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Michael R. Totaro, Totaro & Shanahan, P.O. Box 789, Pacific Palisades, CA 90272 310 573 0276 or Mtotaro@aol.com.

## C.    Disclaimer

The financial data relied upon in formulating the Plan is based on Status Reports, Monthly Operating Reports, Mediation, Conversations and E-mails with creditors and a review of the records of the subsidiaries of Debtors. The information contained in this Disclosure Statement is provided by David Montoya, Steve London and Rapid Notify, Inc. The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan. However the two largest unsecured creditors have approved each of the terms set forth in the Plan and each of the alternatives set forth therein.

## II.

## BACKGROUND

## A.    Description and History of the Debtor's Business

The Debtor is a holding company. 58.5% of its' stock is owned by TICC Capital Corp., an investment company that holds a second lien on any assets. 39.2% of its' stock is owned by Seaview Mezzanine Fund, LP which holds a first lien on any assets. The remaining 2.3% is held by approximately 1000 minority shareholders. Debtor conducts no business on its own. Instead it acts through the business of its subsidiary Rapid Notify, Inc. ("Rapid").  In its simplest form, Rapid has approximately 180 active contracts with government related entities to notify their subscribers in the event of emergencies. There are also an additional 17 inactive accounts and Debtor expresses no opinion on whether these accounts will become active in the future. These accounts are set forth in Exhibit A to this disclosure and incorporated herein by reference.

**F 3017-1**

Because these contracts are government related, they are not long term. They are subject to renewal each year and cannot be sold or assigned. For this reason neither Debtor nor Rapid has any liquidation value. What it has is income since there is no indication the agencies have been unwilling to extend the contracts and have done so yearly since approximately 2007 to the present.

**B.    Principals/Affiliates of Debtor's Business**

The directors of the Debtor are David Montoya, Steven London and Scott Hartman. The stock ownership of the business is as described above.

**C.    Management of the Debtor Before and After the Bankruptcy**

Management of the Debtor before and after the bankruptcy proceeding will fall to the three directors named above.

**D.    Events Leading to Chapter 11 Filing**

The following is a brief summary of the events leading to the bankruptcy filing. The reason for its brevity is because there are limited claims held by parties that are familiar with the years of litigation that led to the filing of this petition.

First as to the claims, former directors Hunter and Taus have combined unsecured claims of $3,443,702.10. (Claims 4 and 7).   Merrill has an unsecured  claim for $154,408.56. (Claim 1)[1] There are two unimpaired secured claims by Seaview and TICC. (Claims 8 and 9.) Three additional unsecured claims by IPFS Corp, Rapid Notify, Inc. and Stradling, Yocca, Carlson & Rauth have either been withdrawn or are in the process of being withdrawn. (Claims 5, 6, and 10.) Finally Shulman Hodges & Bastian (Shulman) has a claim for $4,509,589.06 which by stipulation, is contingent on their collection efforts. (Claim 3) This accounts for all 10 claims that were filed and leaves the voting members to be Hunter, Taus and Merrill all of whom are intimately familiar with this matter.

The underlying litigation began with a lawsuit by Genutec against current and former board members which resulted in verdicts in Genutec's favor against Leon Danna (Danna) and Johan Hebdrick Smit Duyzentkujnst (Johan).  Danna is currently in Bankruptcy and Debtor has filed an adversary proceeding to declare the debt non-dischargeable in case number 6:12-ap-1017-SY. Shulman, being an

---

[1] Merrill filed a duplicate claim as claim 2 but withdrew it.

**F 3017-1**

1    international firm, feels Johan has assets overseas that may be reached to satisfy the portion of the

2    $9,575,729.80 judgment in favor of Debtor that applies to Johan.

3        In the same litigation Debtor was not successful against creditors Hunter and Taus resulting in the

4    awards that led to this filing and eventual settlement. The validity of the awards are currently on appeal but

5    that appeal will be dismissed upon confirmation of this Chapter 11 plan. Confirmation of this Plan will also

6    resolve any potential litigation Hunter and Taus have threatened against Seaview, TICC or any of the

7    directors of Debtor. In short, this Plan contemplates a global resolution of years of litigation.

8    **E.    Significant Events During the Bankruptcy**

9        **1.    Bankruptcy Proceedings**

10        The following is a chronological list of significant events which have occurred <u>during</u> this case:

11        There have been very few "in court" events during this proceeding. Most of the events have taken

12    place in meetings and conversations between litigation counsel and the creditors in an effort to keep the

13    costs down.  Obviously this led to some miscommunication as indicated by the last motion to extend the

14    time to file the plan and disclosure which the Court denied.

15        However since its inception Debtor has filed its monthly operating reports, albeit not always in a

16    timely manner, has made its insurance payments, has paid its quarterly fees, has attended mediation, has

17    complied with status report requirements and has worked with creditors to reach an amicable resolution to

18    settle a very large amount of debt by a business that has no independent income and no liquidation value.

19    Surprisingly all of this has been accomplished.

20        During the course of the proceedings this Court has approved the employment of general

21    insolvency counsel and special litigation counsel which saved the estate funds. It has also approved a

22    contingency arrangement between Debtor and Shulman which again saved the estate funds which are now

23    available to creditors and which may help pay the debt in a more prompt manner.

24        As to Seaview Mezzanine Fund, LP (Seaview) that entity has submitted an amended claim 9-2 for

25    a slightly increased amount to $1,062,500, now as a secured claim due to an audit and communications

26    with TICC Capital Corp. which disclosed that Seaview is in first position as a secured creditor. However,

27    Seaview has elected to defer any payment until after all of the unsecured debt has been paid.

28

**F 3017-1**

Finally, Debtor has also accomplished the withdrawal of certain claims that would have interfered with the eventual settlement. Rapid Notify, Inc., POC 10, has withdrawn its claim entirely. (Docket 161) Also IPFS has withdrawn its' claim. (Docket 137.) There are no other pending matters.

**2.   Other Legal Proceedings**

There are no other legal proceedings pending that will survive confirmation.

**3.   Actual and Projected Recovery of Preferential or Fraudulent Transfers**

No actions to recover fraudulent or preferential transfers are anticipated.

**4.   Procedures Implemented to Resolve Financial Problems**

The problems that led to this filing are entirely related to litigation that are being resolved by the settlement leading to the Plan to be confirmed and thus the confirmation of the plan will solve the problems.

**5.   Current and Historical Financial Conditions**

The financial condition of Debtor is directly dependent on the financial condition of Rapid. At this point in time there appears to be no reason why Rapid cannot continue with the same business, and continue to grow, as it has been engaged in for the last 8 years. As will be discussed in the Risk section, in any given year a government contract could be terminated. However, there is limited competition and Rapid is a known entity. There appears to be no reason to terminate its contracts.

There has been no formal appraisal of the assets of Debtor since any such appraisal would have to be based on financial worth of Rapid and that in turn would have to be based on the long term viability of the government contracts, the term of which is unknown. However all financials were provided to Hunter and Taus and presumably those were relied on in reaching the determination to enter into a settlement for Plan treatment.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.   What Creditors and Interest Holders Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various Classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**F 3017-1**

**B.    Unclassified Claims:**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following claims in a class.

**1.    Administrative Expenses:**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following lists all of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan.

**a.    United States Trustee Fees:**

All United States Trustee fees will be paid as they become due within 30 days after the end of each quarter until Debtor is discharged. It is anticipated that the total disbursements under the Plan will be approximately $20,500 per month which is comprised of the payment to the creditors and insurance. Based on this figure the quarterly payment to the United States Trustee should be $650.00 a quarter.

**b.    Legal Fees:**

Debtor has incurred legal fees for General Insolvency Counsel, Totaro & Shanahan and Special Litigation Counsel Candice Bryner. Those fees will be paid on the effective date subject to the procedures set forth below. The creditor's committee has never appointed counsel to represent it.

**c.    Other Fees:**

To the best of Debtor's knowledge there are no other administrative fees.

**d.    Court Approval of Fees Required:**

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

As indicated above, the Debtor will need to pay 100% of administrative claims on the

**F 3017-1**

Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim.  As indicated elsewhere in this Disclosure Statement, Debtor, through Rapid, will deposit or pay directly sufficient cash to make such payments on the Effective Date of the Plan.  The source of this cash will be revenues generated by Rapid from the contracts attached hereto as Exhibit A.

**2.    Priority Tax Claims**:

There are no priority tax claims.

**C.    Classified Claims and Interests**

**1.    Class 1:  Secured Claims:**

Secured claims are claims secured by liens on property of the estate. The following lists all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

**Class 1a: Seaview Mezzanine Fund, LP POC 9-1 and 9-2**

As noted above, after the filing of the Petition and after and internal audit it was discovered that Seaview is in first position and secured by a first lien and ownership interest of 38.2% of Debtor. It is not impaired as it has no arrangement for ongoing payments on its' investment. If and when Debtor becomes profitable, which presumably will be after the current claims are paid, Seaview would be entitled to share in the profits. Until then it is simply an investor which is not seeing a return on its' initial investment.

**Class 1b. TICC Capital Corp. POC 8**

TICC is in the same position as Seaview except that it holds a second lien and 58.5% ownership interest. It is not impaired as it has no arrangement for ongoing payments on its' initial investment. If and when Debtor becomes profitable, which presumably will be after the current claims are paid, TICC would be entitled to share in the profits. Until then it is simply an investor which is not seeing a return on its' initial investment.

**2.  Class 2: Priority Unsecured Claims**:

There are no claims in this section.

**3.  Class 3: General Unsecured Claims**:

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following identifies this Plan's treatment of the class containing all of Debtor's general unsecured claims.  Each of the general unsecured claims will be treated in an identical manner, except for Shulman

which because of the contingent nature of the claim is in its' own class. These claims are as follows with their treatment thereafter:

**Class 3a: General Unsecured**:

| | | | |
|---|---|---|---|
| 1. | Hunter | POC 4 | 2,326,661.30 |
| 2. | Taus | POC 7 | 1,117,040.80 |
| 3. | Merrill | POC 1 | 154,408.56 |
| | | POC 2 | Withdrawn Docket 49 |
| 4. | IPFS Corp | POC 5 | Withdrawn Docket 137 |
| 5. | Stradling | POC 6 | OBJ Withdrawn |
| 6. | Rapid | POC 10 | Withdrawn Docket 161 |

The total of these claims are $3,598,110.16.

Hunter has 64.66% of the total claim.

Taus has 31.04% of the total claim.

Merrill has 04.30% of the total claim.

### TREATMENT OF THE UNSECURED CLASS 3A CLAIMS

Debtor and have agreed to three alternative plans to pay the agreed upon unsecured debt. How much the unsecured creditors will receive depends on the payment at various stages of the proceeding. Each will be set forth:

**Alternative 1:**

This alternative is triggered by Debtor's ability to obtain financing on or before the Effective Date of the Plan. If Debtor should obtain such financing and is able to make a lump sum payment, then on the Effective Date (the 30th day after the signed order confirming the Chapter 11 Plan) Debtor will make a payment of $750,000.00 to be distributed to Hunter and Taus pro-rata for their undisputed allowed claims which is 20.8%. Merrill will also receive a lump sum payment of 20.8% of its claim which comes to $32,116.98. Following this distribution Debtor will be permitted to file for a final decree, discharge and closure.

**Alternative 2**:

This alternative is triggered by Debtor's inability to pay the $750,000 on the Effective Date. If Debtor cannot obtain the financing to fund a lump sum payment on the Effective Date, Debtor will pay the

**F 3017-1**

unsecured creditors $1,251,600.00 over 8 years at $12,500.00 a month with a balloon payment of $51,600 at the end of year 8. All payments to be paid pro-rata according to the above percentages. Under this alternative, including the balloon payment Hunter would receive $809,284.56. Taus would receive $388,496.64. Merrill would receive $53,818.80. Payments are to begin on the Effective Date. (The 30th day after the signed order confirming the Chapter 11 Plan).

**Alternative 3:**

As an incentive to pay the debt early, Debtor and Creditors Taus and Hunter, who control the voting class, have agreed to a schedule of discounts if Debtor is able to accomplish an early pay-off of the debt. If during any of the years following confirmation, Debtor pays the remaining balance in full the following discounts will apply:

Year 1: 25%

Year 2: 22%

Year 3: 19%

Year 4: 16%

Year 5: 13%

Year 6: 10%

Year 7:  7%

The Taus and Hunter, who control the voting class, have indicated that each of the above alternatives are acceptable to each of them and should be incorporated into what will be a consensual plan.

**Class 3b:  Special General Unsecured:**

1.      Shulman          POC 3          $4,509,589.06

This claim is segregated into its own class since Shulman has undertaken the collection of the judgment against Johan and Danna on a contingency basis. The court has previously approved the employment of the Shulman firm on a contingency basis. (Docket 63.) Therefore there is no disbursement under the plan that would dilute the disbursement of funds to the remaining unsecured creditors.

**Class 4: Interest Holders**:

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor.  If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders.  If

the Debtor is a partnership, the interest holders include both general and limited partners.  If the Debtor is an individual, the Debtor is the interest holder. The following identifies the Plan's treatment of the Class of interest holders.

**Class 4a:**

Seaview will retain its' 38.2% ownership interest in Debtor and retain its' first position.

**Class 4b:**

TICC will retain its' 58.5% ownership interest in Debtor and retain its' second position.

**Class 4c:**

The minority shareholders as a group will retain their 2.3% ownership interest in Debtor.

**D.    Means of Effectuating the Plan**

**1.    Funding for the Plan**

The plan will be funded by the revenues of Rapid. Payments will be made on a monthly basis pro-rata to the unsecured creditors except that Debtor, in its' sole discretion, may elect to prepay the entire year's payments in December for the upcoming year if funds are available. Rapid Notify, Inc. is a corporation with one Director, Scott Hartman. Mr. Hartman is the Chairman of the Board of Directors of Genutec and thus Rapid is required to do exactly what Mr. Hartman tells it to do. In other words, Rapid only exists to perform at the direction of Mr. Hartman and Genutec. Therefore all funding, ordered by Mr. Hartman of Rapid, must be complied with by Rapid. There is no discretion not to provide funding as needed. *See* Hartman Declaration, *supra,* p. 21.

**2.    Post-Confirmation Management**

The directors of Debtor will continue to manage Debtor post-confirmation.

**3.    Disbursing Agent**

Steven London shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without a bond and shall receive no compensation for distribution services rendered but shall be entitled to reimbursement for out of pocket expenses incurred pursuant to the Plan.

**E.      Risk Factors**

The only risk of the proposed plan is that the contracts which fund the plan could be canceled by the various government entities. Neither Debtor nor Rapid have any say so in this but clearly both have an interest in doing whatever possible to assure this does not occur. Rapid intends to provide excellent service to assure the continued viability of the contracts and Debtor intends to honor its agreement under the Plan. Since there is always the need for emergency notification worldwide, the overall risk to non-performance appears to be minimal.

**F.      Other Provisions of the Plan**

    **1.      Executory Contracts and Unexpired Leases**

Debtor has no contracts or leases to either reject or assume.

    **2.      Changes in Rates Subject to Regulatory Commission Approval**

This Debtor is not subject to governmental regulation of rates.

    **3.      Retention of Jurisdiction**

The Court will retain jurisdiction to the extent provided by law.

**G.      Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability: None.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of

**F 3017-1**

alerting readers about basic confirmation issues, which they may wish to consider, as well as certain

deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion

contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements

include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays

creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is

feasible.  These requirements are <u>not</u> the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.    Who May Object to the Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not

everyone is entitled to vote to accept or reject the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest

holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired

class.

**a.    What is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the

right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a

motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder

holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the

objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS SEPTEMBER 19, 2014.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was

not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim

is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the

claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.  What is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that class 3a is impaired and that holders of claims in this class is therefore entitled to vote to accept or reject the Plan. The Proponent believes that classes 1a, 1b and 3b are unimpaired and that holders of claims in each of these classes therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 3.  Who is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.  Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.  Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired

# F 3017-1

1  classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-

2  accepting classes, as discussed later in Section {IV.A.8.}.

3      **6.  Votes Necessary for a Class to Accept the Plan**

4      A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number

5  and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan.

6  A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the

7  interest-holders of such class which actually voted, voted to accept the Plan.

8      **7.  Treatment of Nonaccepting Classes**

9      As noted above, even if all impaired classes do not accept the proposed Plan, the Court may

10  nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.

11  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly

12  referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of

13  claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and

14  if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has

15  not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

16      **8.  Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

17      The party proposing this Plan will ask the Court to confirm this Plan by cramdown on impaired class

18  3a if any class does not vote to accept the Plan.

19  **B.    Liquidation Analysis**

20      Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.

21  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or

22  interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain

23  under the Plan property of a value not less than the amount that such holder would receive or retain if the

24  Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

25      In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors

26  are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative

27  claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to

28  their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their

**F 3017-1**

1  allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders

2  receive the balance that remains after all creditors are paid, if any.

3      For the Court to be able to confirm this Plan, the Court must find that all creditors and interest

4  holders who do not accept the Plan will receive at least as much under the Plan as such holders would

5  receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for

6  the following reasons:

7      In a Chapter 7, the trustee would have to attempt to sell the business. The first problem the trustee

8  would have is that Debtor's sole source of income is revenue generated from contracts held by Rapid which

9  are not assignable and not sellable. Therefore even assuming that the trustee could attempt to control the

10  contracts they would have no value in a sale.

11      Further, to pay the creditors, the trustee would have to monitor the business of the subsidiary for a

12  substantial period of time and keep it profitable. This would involve placing a knowledgeable person

13  overseas, training that person, and attempting to assure that every year the contracts could be negotiated.

14  Finally even if Debtor could be sold the book value seems to be about $3,500,000 and there is currently

15  about $4,500,000 in secured debt leaving nothing for the unsecured creditors. Therefore in a Chapter 7 it is

16  unlikely the trustee would be in a position to generate any funds for the unsecured creditors.

17      The only questionable factor is the judgments that Debtor has in its favor. There are two smaller

18  judgments, one for $119,814.80 and one for $151,000.00 which Debtor considers to be uncollectable.

19  There is the judgment that Shulman is attempting to collect for $9,575,719.80 a portion of which may be

20  collectable. However, whether it is or not and when it may be collected is completely unknown.

21      Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive

22  at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7

23  liquidation:

24                          **ASSETS VALUED AT LIQUIDATION VALUE**

25  **LIQUID ASSETS**                              **0**

26  **FIXED ASSETS**

27      **Office Equipment:**                  **$    5,000.00**

28  **OTHER ASSETS:**

**F 3017-1**

| | |
|---|---|
| **Active Contracts:** | **$3,000,000.00** |
| **Judgments (Face Value)** | **$9,575,729.80** |
| | **$  119,814.80** |
| | **$    151,000.00** |
| **TOTAL ASSETS AT LIQUIDATION** | **$12,846,544.60** |
| | |
| **Less Secured Debt:** | **$ 4,695,000.00** |
| **Less Ch 7 Trustee Fee:** | **$    318,646.32** |
| **Less Unsecured Claims** | **$ 8,107,699.72** |
| **Total Claims and Expenses** | **$13,131,346.04** |

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A**

**CHAPTER 7 LIQUIDATION:**

While it might appear the unsecured creditors would receive 96% of their claims, that figure is illusory. That return would be conditioned on all judgments being received with no cost to the estate. That is not only improbable but impossible. The reality is that there would be no dividend to the unsecureds since the contracts are not assignable or sellable and it is unrealistic to assume the trustee would run a worldwide business like Rapid for 8 years profitably to pay creditors.

In addition, at this point there is no reason, other than the optimistic view of the Shulman firm, that any of the judgments are collectible. Since the Shulman firm has over $4,000,000 in time invested in the litigation it is reasonable for them to attempt to see what may be recouped, however at this point, any such recovery would be nothing but pure speculation since Debtor has no firm information concerning the existence of any assets which may be reached to satisfy any judgment.

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER**

**THIS PLAN:**

Approximately 20.8% or 33.5% depending on whether payment is made on the Effective Date or paid over 8 years.

**C.    Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that

confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or

reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.

In this case it is apparent that the Debtor itself has no means to fund a plan; it is entirely dependent on the income stream of its subsidiary Rapid Notify, Inc.

Attached to this disclosure statement as Exhibit A is a complete list of the 180 active contracts that provide the income to Rapid and thus will provide the payment to the creditors over the course of the Plan. In reaching their decision to enter into the three approved repayment plans set forth above, the creditors had full access to the financials of Rapid and presumably satisfied themselves that repayment according to the above terms was not only possible but likely.

As the attached exhibit demonstrates, Rapid's annual gross income grew from $665,315.00 in 2011 to $865,099.00 in 2015. The monthly income rose from $55,443 to $72,091 which apparently gave the creditors confidence that Rapid could fund the necessary $12,500.00 payment necessary to complete the Chapter 11 plan on a monthly basis over 8 years if that became necessary.

In considering feasibility this Court should keep in mind that as thin as this presentation is, the two creditors who have approved the settlement and who have the most to lose, are fully represented by competent counsel, have taken six months to do their due diligence, have had full access to any documents they requested and have been very aggressive in their representation of their clients. This proposed plan would not have been possible without their approval and review of the underlying finances.

**V.**

**EFFECT OF THE CONFIRMATION OF PLAN**

**A.     Discharge (105)**

This Plan provides that upon completion of plan payments Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141. However, the discharge will not discharge any liability imposed by the Plan.

**B.     Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.    Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

**E.    Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

**F.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate. The automatic stay will be reimposed upon the revested property, but only to  the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

**G.    Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall file a  motion with the Court to obtain a final decree to close the case.

**H.    Pending Litigation and Appeals:**

Upon confirmation of the Chapter 11 plan, all pending litigation in State Court between Taus and Hunter shall be dismissed with prejudice. In addition any appeal involving Taus and Hunter shall be dismissed.

DATE: <u>April 22, 2015</u>

<u>Genutec Business Solutions, Inc.</u>
Name and Identity of Plan Proponent

<u>Scott Hartman</u>
Signature of Plan Proponent
Scott Hartman for Genutec Business Solutions, Inc.

<u>/s/ Michael R. Totaro</u>
Signature of Attorney for Plan Proponent

<u>Michael R. Totaro</u>
Name of Attorney for Plan Proponent

<u>Totaro & Shanahan</u>
Name of Law Firm for Plan Proponent

**VI.**

**DECLARATION OF SCOTT HARTMAN IN SUPPORT**

**OF ORIGINAL DISCLOSURE STATEMENT SUPPORTING ORIGINAL CHAPTER 11 PLAN**

I, Scott Hartman, declare,

1.      I am the Chairman of the Board of Directors of  Genutec Business Solutions, Inc and have been involved in the negotiations and litigation with the creditors in the within matter. As such I have personal knowledge of the following facts and if called to testify I could and would competently testify thereto.

2.      I have reviewed the attached disclosure and proposed Chapter 11 plan and provided information for the same. I know the contents to be true and accurate to the best of my knowledge and also agree that the projections therein are both realistic and feasible.

3.      It is my belief that the Debtor is capable of making the plan payments and also eventually obtaining the necessary funding to terminate the plan earlier than the 8 year period specified in the plan.

4.      In addition I am the sole director of Rapid Notify, Inc. in my capacity of Chairman of the Board of Genutec I am in the position of dictating to Rapid of how funds are to be disbursed. When I instruct that funds from Rapid are to be disbursed to Genutec to pay its' bills there is no discretion for Rapid to refuse. As such, Rapid is fully committed to fulfilling Genutec's obligations under the proposed plan.

I declare under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct. Executed on June 17, 2015 at New York, New York.

Scott Hartman

Scott Hartman

**F 3017-1**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

**COMPLETE LIST OF ALL CONTRACTS OF RAPID NOTIFY, INC.**

| Active Status | Customer | Renewal Month | Calendar 2014 Revenue | Current Annual Revenue |
|---|---|---|---|---|
| Active | Port Hope, Canada-0202 | 1 | 11,004 | 11,004 |
| Active | R.E Ginna Nuclear Power Plant, LLC-0108 | 1 | 11,004 | 11,004 |
| Active | BAE Systems | 1 | 9,852 | 9,852 |
| Active | Saint Francis Health | 1 | 0 | 9,012 |
| Active | NBC Universal, Inc. | 1 | 8,496 | 8,496 |
| Active | Suncor Energy Products Inc | 1 | 6,996 | 6,996 |
| Active | Warren County Dept of Public Safety | 1 | 6,648 | 6,648 |
| Active | City of Sarasota | 1 | 6,000 | 6,000 |
| Active | Dearborn County, IN | 1 | 6,000 | 6,000 |
| Active | Honeywell International, Inc | 1 | 5,748 | 5,748 |
| Active | STP Nuclear Operating Co.-0024 | 1 | 4,704 | 4,704 |
| Active | Solvay Chemicals, Inc-0163 | 1 | 4,404 | 4,404 |
| Active | Manteca Police Dept | 1 | 4,392 | 4,392 |
| Active | City of Columbia | 1 | 4,272 | 4,272 |
| Active | Honeywell-Buffalo Research Lab-0096 | 1 | 3,756 | 3,756 |
| Active | PVS Chemicals, Inc. (New York)-0098 | 1 | 2,844 | 2,844 |
| Active | Atherton Police Dept. | 1 | 1,656 | 1,656 |
| Active | Kemptville District Hospital | 1 | 1,500 | 1,500 |
| Active | Greater Lynn Senior Service | 1 | 1,248 | 1,248 |
| Active | Bluewater Health | 1 | 1,104 | 1,104 |
| Active | Summit Mountain Holding | 1 | 0 | 996 |
| Active | Pacific Northwest University of Health Sc | 1 | 756 | 756 |
| Active | West Hills Christian School-0204 | 1 | 504 | 504 |
| Active | Automated Logic Corp | 1 | 0 | 504 |
| Active | M&M Properties | 1 | 0 | 504 |
| Active | Nongshim | 1 | 0 | 504 |
| Active | Wheaton | 1 | 0 | 504 |
| Cxld | Mt. Pleasant, Town of | 1 | 5,496 | 0 |
| Active | Deep River, Canada-0125 | 2 | 11,556 | 11,556 |
| Active | Kincardine, Canada-0152 | 2 | 8,256 | 8,256 |
| Active | Temple Terrace, FL-0271 | 2 | 8,256 | 8,256 |
| Active | Warren County, NJ-0214 | 2 | 7,500 | 7,500 |
| Active | Oxea Corporation 374 | 2 | 5,748 | 5,748 |
| Active | Apache Nitrogen | 2 | 5,004 | 5,004 |
| Active | Seabrook-FPL-0123 | 2 | 4,956 | 4,956 |
| Active | Equistar, Bay City TX-0134 | 2 | 4,404 | 4,404 |
| Active | Cytec, Louisiana-0084 | 2 | 3,696 | 3,696 |
| Active | Chemtrade Performance Chemicals-0148 | 2 | 2,628 | 2,628 |
| Active | Bendix | 2 | 1,343 | 1,596 |
| Active | Royal Ottawa Health Care Group | 2 | 996 | 996 |
| Active | Agusta Westland | 2 | 0 | 996 |
| Active | Allamuchy Township, NJ | 2 | 876 | 876 |
| Active | Brown School | 2 | 756 | 756 |
| Active | Barkman Honey | 2 | 0 | 504 |
| Active | Schenectady County, NY-0001 | 3 | 19,020 | 19,020 |
| Active | El Dorado Irrigation District | 3 | 7,572 | 7,572 |

| | | | | |
|---|---|---|---|---|
| Active | Dominion Nuclear - CT-0249 | 3 | 6,600 | 6,600 |
| Active | Cameco Corp - Blind River Refinery | 3 | 5,496 | 5,496 |
| Active | STVT-AAI Education (Ancora Education) | 3 | 3,276 | 4,635 |
| Active | City of San Carlos | 3 | 2,196 | 2,196 |
| Active | Winchester District Memorial Hospital | 3 | 2,004 | 2,004 |
| Active | Crocker Park Delaware, LLC | 3 | 996 | 996 |
| Active | Maple Root Corporation | 3 | 996 | 996 |
| Active | North Bay Regional Health Center | 3 | 996 | 996 |
| Active | Services Management Corporation | 3 | 996 | 996 |
| Active | Bristol Housing | 3 | 830 | 996 |
| Cxld | Banner & Witcoff | 3 | 166 | 0 |
| Active | L.A. County | 4 | 9,468 | 9,468 |
| Active | USAG Adelphi Lab CTR | 4 | 1,800 | 1,920 |
| Active | Walker Information, INc | 4 | 996 | 996 |
| Active | Glimcher Realty Trust | 4 | 747 | 996 |
| Active | Meadowbrook LLC | 4 | 747 | 996 |
| Active | Texas State Board of Pharmacy | 4 | 747 | 996 |
| Active | Evonik Degussa Corporation | 5 | 10,728 | 10,728 |
| Active | Oak Forest, IL-0265 | 5 | 10,176 | 10,176 |
| Active | Rhode Island Corrections-0146 | 5 | 7,500 | 7,500 |
| Active | South Coast Plaza | 5 | 4,500 | 4,500 |
| Active | Eastman Chemicals | 5 | 4,404 | 4,404 |
| Active | Honeywell Int'l Inc. (IL)-0255 | 5 | 4,404 | 4,404 |
| Active | Shell Geismar-LA-0028 | 5 | 3,996 | 3,996 |
| Active | Billy Graham Evangelistic Association | 5 | 1,776 | 1,776 |
| Active | Host International, Inc | 5 | 1,776 | 1,776 |
| Active | Ferragamo USA | 5 | 996 | 996 |
| Active | Lenze Americas | 5 | 996 | 996 |
| Active | Texas Dept of Information Resources | 5 | 996 | 996 |
| Active | Caldwell Tanks, Inc | 5 | 664 | 996 |
| Active | Pincher Creek Community Emergency Mgmt | 5 | 696 | 696 |
| Active | The Geo Group, Inc | 6 | 47,340 | 47,340 |
| Active | Northshore-0052 | 6 | 20,208 | 20,208 |
| Active | Cucamonga Valley Water Dist-0212 | 6 | 12,800 | 12,800 |
| Active | Quantum Resources Management LLC | 6 | 10,500 | 10,500 |
| Active | Eli Lilly and Company-0151 | 6 | 9,396 | 9,396 |
| Active | Town of Johnston | 6 | 4,674 | 9,348 |
| Active | City of San Mateo | 6 | 7,500 | 7,500 |
| Active | City of Lynn | 6 | 5,940 | 5,940 |
| Active | Belmont Safe Schools Program | 6 | 5,580 | 5,580 |
| Active | Harbor Beach Area Fire Dept.-0155 | 6 | 5,496 | 5,496 |
| Active | Town of Coventry RI | 6 | 4,956 | 4,956 |
| Active | Schoharie County, NY | 6 | 4,500 | 4,500 |
| Active | Terra, CN-0072 | 6 | 3,696 | 3,696 |
| Active | Town of Southwest Ranches | 6 | 3,504 | 3,504 |
| Active | Markham Industrial Group-0053 | 6 | 3,408 | 3,408 |
| Active | FCIUSA, INC | 6 | 1,200 | 1,200 |
| Active | Louis Wohl & Sons | 6 | 252 | 252 |

| | | | | |
|---|---|---|---|---|
| Active | Kenai Peninsula-0131 | 7 | 13,920 | 13,920 |
| Active | County of Harnett | 7 | 12,504 | 12,504 |
| Active | San Francisco, CA-0130 | 7 | 12,072 | 12,072 |
| Active | Haywood County, NC-0252 | 7 | 7,644 | 7,644 |
| Active | Conoco Phillips-Santa Maria Facility-0150 | 7 | 7,500 | 7,500 |
| Active | EMSA,OK-0289 | 7 | 6,552 | 6,552 |
| Active | Glenn County Sheriffs Dept | 7 | 6,516 | 6,516 |
| Active | Belmont Police Dept. | 7 | 6,504 | 6,504 |
| Active | Sunmount DDSO-0236 | 7 | 6,252 | 6,252 |
| Active | Westfield, City of | 7 | 6,252 | 6,252 |
| Active | Oak Park | 7 | 6,000 | 6,000 |
| Active | City of New Westminster-0266 | 7 | 5,796 | 5,796 |
| Active | Los Altos Hills | 7 | 5,652 | 5,652 |
| Active | Bridgewater Correct. Complex-0083 | 7 | 5,496 | 5,496 |
| Active | Infineum USA L.P.-0058 | 7 | 3,996 | 3,996 |
| Active | Central County Fire Dept (Burlingame) | 7 | 3,096 | 3,096 |
| Active | Central County Fire Dept (Hillsborough) | 7 | 3,096 | 3,096 |
| Active | Westat | 7 | 1,440 | 2,880 |
| Active | Warren County Health Dept | 7 | 1,500 | 1,500 |
| Active | Culp, Inc | 7 | 540 | 1,296 |
| Active | Albuquerque Fire Dept | 7 | 625 | 1,250 |
| Active | Waverly Central School Dist.-0215 | 7 | 996 | 996 |
| Active | District of Pinawa | 7 | 924 | 924 |
| Active | Maitland, Invista Canada Company-0029 | 8 | 9,900 | 9,900 |
| Active | Princeton Township, NJ-0217 | 8 | 9,504 | 9,504 |
| Active | Yuba City Fire Dept | 8 | 6,156 | 6,156 |
| Active | Westborough, MA- Dept of Youth | 8 | 5,388 | 5,388 |
| Active | Attleboro Police Department | 8 | 4,836 | 4,836 |
| Active | Fleetweather, Inc | 8 | 1,646 | 3,950 |
| Active | Nestle Health Science | 8 | 450 | 1,080 |
| Active | Cospolich, Inc | 8 | 996 | 996 |
| Active | Mora Valley Community Health Services | 8 | 996 | 996 |
| Active | Urban Justice Center | 8 | 210 | 504 |
| Active | AHS Southcrest Hospital | 8 | 167 | 500 |
| Active | St John Health System | 9 | 772 | 2,316 |
| Acitve | Factors Goup of Companies | 9 | 740 | 2,220 |
| Active | Investors Bank | 9 | 1,824 | 1,824 |
| Active | Monmouth Country Park System | 9 | 500 | 1,500 |
| Active | DFCU Financial | 9 | 332 | 996 |
| Active | Eurofins Lancaster Laboratories, Inc | 9 | 332 | 996 |
| Active | Institute for Systems Biology | 9 | 332 | 996 |
| Active | Bridgehampton Union Free S.D.-0220 | 9 | 168 | 168 |
| Active | Washington County, OH-0183 | 10 | 8,256 | 8,256 |
| Active | Woodside Fire Protection District | 10 | 8,052 | 8,052 |
| Active | Ameren UE - Bagnell Dam | 10 | 5,496 | 5,496 |
| Active | Exxon Mobil,AL | 10 | 5,496 | 5,496 |
| Active | Exxon,CA-0118 | 10 | 5,388 | 5,388 |
| Active | Allegheny Energy Supply Company, LLC | 10 | 5,004 | 5,004 |

| | | | | |
|---|---|---|---:|---:|
| Active | Westborough Water District-0257 | | 10 | 4,956 | 4,956 |
| Active | City of Bakersfield | | 10 | 4,392 | 4,392 |
| Active | Coventry Housing Authority | | 10 | 1,380 | 1,380 |
| Active | Downtown Dallas, Inc | | 10 | 1,248 | 1,248 |
| Active | California Transplant Donor Network | | 10 | 1,164 | 1,164 |
| Active | Arizona Office of Technologies | | 10 | 207 | 828 |
| Active | Lacey Manufacturing | | 10 | 624 | 624 |
| Active | Wrobel Engineering | | 10 | 504 | 504 |
| Active | City of Toronto | | 11 | 14,712 | 14,712 |
| Active | Santa Fe Springs, CA-0049 | | 11 | 11,496 | 11,496 |
| Active | SABIC Innovative Plastics | | 11 | 10,236 | 10,236 |
| Active | Phillips 66 | | 11 | 7,596 | 7,596 |
| Active | Freeport-McMoRan Oil & Gas | | 11 | 6,756 | 6,756 |
| Active | Alternatives Unlimited, Inc | | 11 | 3,504 | 3,504 |
| Active | Sandia National Laboratories | | 11 | 3,000 | 3,000 |
| Active | Lutron Electronics Co, Inc | | 11 | 1,752 | 1,752 |
| Active | Carling Technologies | | 11 | 1,248 | 1,248 |
| Active | Council on Accreditation | | 11 | 996 | 996 |
| Active | Community Hope, Inc | | 11 | 166 | 996 |
| Active | Georgia Department of Community Affairs | | 11 | 166 | 996 |
| Active | Alma Bank | | 11 | 0 | 996 |
| Active | L3 Mobile-Vision, Inc | | 11 | 504 | 504 |
| Active | Quisk | | 11 | 84 | 504 |
| Active | Durham Regional Headquarters-0060 | | 12 | 18,048 | 18,048 |
| Active | Blair County, PA | | 12 | 16,020 | 16,020 |
| Active | Questar Corporation | | 12 | 15,504 | 15,504 |
| Active | Raytheon Systems Company | | 12 | 6,504 | 6,504 |
| Active | Afton Chemical Corporation-0161 | | 12 | 4,836 | 4,836 |
| Active | Quantum Resources | | 12 | 3,756 | 3,756 |
| Active | ArcelorMittal USA | | 12 | 2,496 | 2,496 |
| Active | L3 Wescam | | 12 | 125 | 1,500 |
| Active | Performance Trust Capital Partners | | 12 | 42 | 504 |
| Active | Old World Industries | | 12 | 0 | 504 |
| Active | Town of Brewster, MA | M | | 3,800 | 3,800 |
| Active | Lake County,  IN-0085 | Q | | 24,996 | 24,996 |
| Active | Ohio County Communications | Q | | 3,600 | 3,600 |
| Active | General Services Administration | Q | | 2,352 | 2,352 |
| Cxld | EMSA – Tulsa | Q | | 12,128 | 0 |
| | | | | **843,278** | **865,099** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: P.O. Box 789, Pacific Palisades, Ca 90272  A true and correct copy of the foregoing document entitled First Amended Disclosure Statement  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.**    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 18, 2015 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
   **See Attached**

☒    Service information continued on attached page

**2.** **SERVED BY UNITED STATES MAIL**:

On June 19, 2015 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Erithe A.Smith 411 W. Fourth St. Santa Ana, CA 92701
Genutec Business Solutions, Inc. 23046 Avenida de La Carlota #600, Laguna Hills, Ca 92653
Securities and Exchange Commission, Attn. Bankruptcy Counsel, 5670 Wilshire Blvd. 11th Fl., Los Angeles, CA 90036

☒    Service information continued on attached page

**3.** **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 19, 2015 | Michael R. Totaro | /s/ Michael R. Totaro |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**F 3017-1**